

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

*Travis Co,*

Honorable Charles E. Baughman
Chief Clerk, Department of Agriculture
Austin, Texas

Dear Sir:

Opinion No. O-2794
Re: Authority of Commissioner
of Agriculture to promul-
gate Regulation No. 12
relating to marking of
citrus fruit under H. B.
623, Acts 43rd Leg., and
related questions.

We have given careful consideration to the ques-
tions presented in your letter of September 30, 1940, which
we restate as follows:

1. Does the Commissioner of Agriculture have au-
thority to promulgate Regulation No. 12 under H. B. 623,
Acts 43rd Legislature?

2. Is it mandatory upon the Commissioner to con-
duct a hearing upon said regulation, when a written protest
thereto has been filed with him?

3. May the Commissioner require that all evidence
and arguments presented at such hearing be submitted in writ-
ing?

Regulation No. 12 is copied in full:

"By virtue of the authority vested in the
Commissioner of Agriculture of the State of
Texas in House Bill No. 623, Acts of the 43rd
Legislature Regular Session, which provides
for the compulsory inspection of certain citrus
fruit, the following Rules and Regulations re-
garding the marking of individual fruit are
hereby promulgated effective September 1, 1940.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"REGULATION NO. 12. No handler shall pack or ship any grapefruit unless said fruit is marked as follows:

"a. Any lot of fruit below the requirements of U.S. No. 3 Grade shall be clearly and indelibly branded, stamped or printed with the word 'CULL' on the rind of each fruit in letters not less than three-eighths (3/8) of an inch high.

"b. Any lot of fruit below the requirements of U.S. No. 2 Grade of Classification of this grade, but meeting the requirements of U.S. No. 3 Grade shall be clearly and indelibly branded, stamped or printed with the words 'THIRD GRADE' on the rind of each fruit in letters not less than three-sixteenths (3/16) of an inch high.

"c. Any lot of fruit branded, stamped or printed 'Third Grade' or 'CULL' as required in this regulation, shall show no other mark.

"d. Any lot of fruit which shows at least seventy-five (75%) percent of the fruit in individual containers clearly marked according to the above designations shall be deemed as complying with these regulations. In order to allow for variations incident to proper grading and handling, not more than ten (10%) percent by count of the fruit in any container may be below the percentage required to be clearly marked, provided the lot as a whole averages seventy-five (75%) percent or more.

"All other Rules and Regulations heretofore promulgated and published shall be in full force and effect.

(Signed) J.E. McDonald
J.E. McDonald
TEXAS COMMISSIONER OF AGRICULTURE"

The pertinent provisions of H. B. 623, Acts 43rd Legislature (which appear as Article 118a, Vernon' Annotated

Civil Statutes) are hereafter set out:

"Section 2. The inspection in the State of Texas of all grapefruit and oranges, and the grades and classifications thereof, shall be under the direction of the Commissioner of Agriculture of the State of Texas, hereinafter known as the Commissioner.

"Section 3. The Commissioner of Agriculture of the State of Texas is hereby empowered and directed to enter into cooperative agreements with the United States Department of Agriculture providing for the inspection of certain citrus fruits and under the terms of said agreements, the Commissioner of Agriculture shall adopt the official U. S. Standards for grapefruit and oranges as applied to the State of Texas. The inspection shall be conducted under the policies outlined by the United States Department of Agriculture under said cooperative agreements. The Commissioner is empowered to establish and enforce such grades, grading rules, and regulations in addition to those established by this Act as he may deem necessary on citrus fruit, which shall not conflict with any provisions of this Act, after a thorough investigation has been made of the needs of the particular citrus fruit for which grades, grading rules and regulations are contemplated. The Commissioner shall cause to be published in one publication of general circulation in each county affected by this Act, the rules and regulations promulgated by him under this Act. Such publications shall be once each week for the three weeks prior to September 1st. Grades established in accordance with provisions of this Act shall not be modified during the current shipping season, of the citrus fruit for which they are established, except as hereinafter provided.

"Section 4. The Commissioner is hereby given power and authority, and it is hereby made his duty, to promulgate rules and regulations relating to the grading, packing and marking of certain citrus fruits as set out in this Act, and it is hereby made his duty to

Honorable Charles E. Baughman, Page 4

enforce same. The Commissioner shall cause
this to be published in some newspaper of
general circulation in the territory affect-
ed by the rules and regulations which he
has promulgated. Only in case of protest,
hearings shall be conducted at places and
at times to be determined by the Commissioner
or his agent, after publications of rules and
regulations have been promulgated, at which
all interested parties will have a right to
be heard. After such publication and public
hearing, the rules and regulations shall be
final, unless written protest by an interest-
ed person or parties shall be made to the Com-
missioner of Agriculture within thirty (30)
days after such rules and regulations have
been published. If the Commissioner after
the hearing of protests refuses to modify
such rules and regulations the interested
person or parties shall have the right to
appeal to the District Court of Travis Coun-
ty. (Emphasis ours)

"Section 5. The Commissioner is hereby
authorized to promulgate such rules and re-
gulations relative to proper marking of con-
tainers, the issue of certificates of inspect-
ion, the tagging of the vehicle of transporta-
tion, and such other rules and regulations as
he deems necessary for the improvement of the
method of marketing of all citrus fruits as
provided for in this Act."

The above quoted sections of the Act can leave no
doubt but that the Legislature has expressly authorized the
Commissioner of Agriculture to promulgate rules and regula-
tions relating to the "marking of certain citrus fruits."
We are unable to detect in Regulation No. 12, as quoted a-
bove, any unreasonable exercise of this legislative mandate.

Nor do we believe that H. B. 623 constitutes an
unconstitutional delegation of power by the Legislature to
the Commissioner of Agriculture. The Act prescribes in ex-
ceptional detail, the duties and powers of the Commissioner.
The power conferred upon him to promulgate regulations has
been carefully circumscribed, and may be exercised only with-
in the restricted limits and for the express purposes delin-

eated in the Act.  Our Courts have many times sanctioned legislation which confers rule-making powers upon administrative agencies.  As declared by the Supreme Court of Texas in San Antonio v. Jones, 28 Tex. 33, and quoted with approval in O'Brien v. Amerman, 112 Tex. 254, 247 3. W. 270:

"The Legislature may grant authority as well as give commands, and acts done under its authority are as valid as if done in obedience to its commands.  Nor is a statute, whose complete execution and application to the subject-matter is, by its provisions, made to depend on the assent of some other body, a delegation of legislative power.  The discretion goes to the exercise of the power conferred by the law, but not to make the law itself.  The law, in such cases, may depend for its practical efficiency on the act of some other body or individual; still it is not derived from such act, but from the legislative authority."

To the same effect is the holding of the San Antonio Court of Civil Appeals in Tuttle v. Wood, 55 S. W. (2d) 1061 (writ of error refused), wherein Judge Smith, in the opinion, stated:

"It is true, of course that the Legislature cannot delegate to an administrative board the power to make a law prescribing a penalty, but it is equally true that it is competent for the Legislature to authorize a commission or board created for that purpose to prescribe duties or ascertain conditions upon which an existing law may operate in imposing a penalty and in effectuating the purpose designed in enacting the law.  It is in pursuance of this authority that railroad commissions, public utility commissions, livestock sanitary commissions, health boards and like agencies exercise their functions and administer and enforce laws relating to their several departments.  In their very nature such laws must be flexible in order to give them practicable application to the diverse conditions which exist within the several states."

Honorable Charles E. Baughman, Page 6

The purposes sought to be accomplished by H. B. 623 and the regulations to be promulgated thereunder are set out in Section 1 of the Act in the following language:

"Section 1. In order to provide the means whereby producers of certain citrus fruit, and all interested parties, may secure prompt and efficient inspection and classification of grades of fruit at reasonable cost, and because it is hereby recognized that the standardization of the citrus fruit industry by the proper grading and classifications of citrus fruit by prompt and efficient inspection under competent authority is beneficial alike to grower, shipper, carrier, receiver, and consumer, in that it furnishes the grower and the shipper prima facie evidence of quality and condition of products, it guarantees the carrier and the receiver of quality of products carried and received by them and assures the ultimate consumer of the quality of the products purchased, this Act is passed."

The foregoing declaration of purpose certainly embraces a legitimate and proper subject for legislative action. The succeeding sections of the Act appear to provide reasonable and appropriate means for effectuating the stated purposes. It is doubtless true that the requirements for grading and marking of fruit impose obligations and expenses upon the growers, packers and shippers which did not exist before. Such is the inevitable by-product of all regulatory legislation. But if the purposes sought to be achieved by a statute are conducive to the public welfare so as to bring it within the broad field of the State's police power, and the means adopted are reasonable, the Courts will not strike down the statute as being a taking of property without due process or compensation, because it imposes additional obligations and expenses upon those to whom it applies. This principle was aptly stated by Chief Justice Fuller, speaking for the United States Supreme Court in Re Rahrer, 140 U. S. 554, 11 Sup. Ct. 865, 35 L.Ed. 572:

"The power of the state to impose restraints and burdens upon persons and

property in conservation and promotion of
the public health, good order and prosperity
is a power originally and always belonging
to the states, not surrendered by them to
the general government, nor directly restrain-
ed by the Constitution of the United States,
and essentially exclusive."

Laws designed to eliminate fraud and promote fair
dealing in business have been consistently upheld by the Tex-
as Courts as a valid exercise of the police power.  Thus in
Nash Hardware Co. v. Morris, 105 Tex. 217, 146 S. W. 874,
the Texas Supreme Court sustained the constitutionality of
the bulk sales law against the contention that it violated
Section 19, Article I of the Texas Constitution, placed an
unreasonable burden upon merchants.  Said the court:

"The Legislature may in the exercise
of the police power regulate by reasonable
requirements the business transactions of
the citizens.  Houston & T. C. Co. v. City
of Dallas, 98 Texas, 396."

In Henry v. State, 260 S. W. 190, the Court of
Criminal Appeals of Texas in holding valid an act regulat-
ing the profession of accounting in this State, said:

"The authority of the state govern-
ment to place restrictions upon the exercise
of lawful vocations is too well settled for
controversy.

"* * *

"The selection of subjects of such leg-
islation and the means of regulation adopted
are primarily subject to legislative decision,
and the presumption of validity and reasona-
bleness obtains in a judicial inquiry unless
the contrary is made to appear."

The case involving a statute most nearly analogous
to the one here under consideration is Ex Parte White, 198
S. W. 583, wherein the Court of Criminal Appeals approved as
a valid exercise of the police power, a statute requiring
every ginner to take and preserve three samples from every
bale of cotton ginned by him.  Because of its peculiar ap-

plicability, we quote at length from the opinion of the Court in the White case:

"Has experience demonstrated that there are evils connected with the preparation of cotton for market, and the marketing of same which affect the state as a whole--the general public welfare? If so, then under the authorities quoted by relator the state, in seeking under the police power to correct and remedy those evils, would not and cannot be held to violate any provision of the federal Constitution. * * *. It has been demonstrated, and we think fully shown by the evidence in this case, that such conditions were not the result of the law of supply and demand, but were brought about by conditions which can, in a measure at least, be remedied by suitable legislation, and this is the object and purpose of the legislation involved in this case. It may not accomplish all that can be accomplished; it may be defective in many particulars; but this does not affect the power of the state to enact legislation of this character if the public welfare demands legislation to remedy the conditions which, at various and sundry periods of our history, brought about the injury of the citizenship of the state as a whole, and which certainly affected not only the welfare of the farmers, the producers of cotton, but as well seriously affected the welfare of every citizen of the state engaged in any legitimate calling, trade, or profession. * * *.

"* * *. If the evils growing out of and connected with ginning cotton has rendered it necessary to regulate the business to eliminate the plating of cotton, to prevent the spraying of cotton, to prevent the sand packing of cotton, and the other evils testified to by witnesses,

Honorable Charles E. Baughman, Page 9

that the law necessarily fastened this
extra charge on the business of ginning
cotton would not render the law obnoxious
to the federal or state Constitution.
There is many a charge made or license
fixed that must be paid or endured nec-
essarily for the public welfare under
the laws of this state and of every state
in this Union.   *  *  *.

"There are but few, if any, men who would
object to the regulation of the prepara-
tion of his product for market, at so small
an expense, if the price he received would
be enhanced in so much greater sum than
that taken; he would deem it adequate com-
pensation for the property taken.  But if
the evils exist, as shown by the testimony
adduced on this hearing, the state under
its police power has the authority to cor-
rect these evils.  *  *  *.

"*  *  *.  If the public welfare demands
and authorizes the passage of such a law,
that it adds a small additional expense to
the preparation for market and marketing of
cotton does not render the law unconstitu-
tional; for this taking is not within the
meaning of the constitutional provisions.

"*  *  *.  The evidence before us shows
such a condition of affairs, such enormous
loss in the marketing of the principal pro-
duct of the state and evils connected with
the system as heretofore practiced, as to
authorize the Legislature to act, and whether
the law will cure all the evils, or additional
legislation may be rendered necessary to ef-
fectuate that purpose, is not a question to
be decided by us in this case, but for future
Legislatures to consider.  That it will not
and does not effectually cure and remedy all
evils shown to exist does not render the law
invalid."

It must be clear that the regulation requiring grad-
ing and stamping of citrus fruit does not offend the Federal

Constitution under the doctrine announced by the United States Supreme Court in Nebbia v. New York, 291 U. S. 502, wherein a state statute setting up elaborate regulations for the milk industry was sustained. Mr. Justice Roberts, speaking for the majority of the Court in that case declared:

"Under our form of government the use of property and the making of contracts are normally matters of private and not public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. As Chief Justice Marshall said, speaking specifically of inspection laws, such laws form 'a portion of that immense mass of legislation, which embraces every thing within the territory of a State * * * all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a State, * * * are component parts of this mass.'

"Justice Barbour said for this court: '* * * It is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem conducive to those ends * * *.'"

We conclude, under the foregoing authorities, that Regulation No. 12 is a valid exercise of express authority conferred upon the Commissioner of Agriculture by H. B. 623, and that the same is not in conflict with the State or Federal Constitutions.

It is our opinion that the Commissioner is required to conduct a hearing upon any newly promulgated regulation

Honorable Charles E. Baughman, Page 11

when written protest has been filed with him within thirty (30) days after publication of the regulation. This is the express and unequivocable mandate contained in Section 4 of the Act above quoted.

In reply to the third question, we believe that the statute contemplates a "hearing" whereat all interested parties may present oral argument and testimony to the Commissioner or his agent. It would doubtless be within the discretion of the Commissioner to request the submission of written evidence and arguments, but this should not preclude the rights of parties to produce oral evidence and to make an oral presentation of their respective positions. If the hearing were to have been limited to the submission of written briefs only, there would have been no occasion for the statute to provide that "hearings shall be conducted at such times and places * * *." In Merritt v. Village of Porchester, N. Y. 8 Hun. 40, it was held that in the absence of statutory requirements that objections be in writing, it was not necessary that written objections be made as a basis for a "hearing."

Yours very truly

ATTORNEY GENERAL OF TEXAS

APPROVED OCT 16, 1940

FIRST ASSISTANT
ATTORNEY GENERAL

By _Walter R. Koch_
Walter R. Koch
Assistant

WRK:RS

